UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------X
                                        :

FRANCESCO PLAZZA and SYLVIE     :
NAUDE, individually and on behalf of all   :
others similarly situated,                   :

                                 Plaintiffs,   :

                                          :

            - against -         :

                                          :

AIRBNB, INC.,                        :

                                 Defendant.   :

----------------------------------------------------------X

16-CV-1085 (VSB)

**OPINION & ORDER**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 1/26/2018

Appearances:

Lucas A. Ferrara
Jeffrey M. Norton
Newman Ferrara LLP
New York, New York

Kent L. Gubrud
Law Office of Kent Gubrud P.C.
New York, New York
*Counsel for Plaintiffs and the Proposed Class*

Roberta A. Kaplan
Kaplan & Company, LLP
New York, New York
*Counsel for Defendant*

VERNON S. BRODERICK, United States District Judge:

      Plaintiffs Francesco Plazza and Sylvie Naude (collectively, "Plaintiffs") bring this

putative class action against Defendant Airbnb, Inc. ("Defendant" or "Airbnb"). Before me is

Airbnb's motion to compel arbitration and dismiss the action. Because Plaintiffs and Defendant

entered into a valid and enforceable arbitration agreement, Airbnb's motion is granted in part and

denied in part, and this action is stayed pending the outcome of arbitration.

# I.    Background

## A.    *Plaintiffs' Claims*

Plaintiff Naude originally created her account and registered as a user with Airbnb on July 29, 2009.  (Naude Decl. ¶ 3; Miller Decl. ¶¶ 4–5.)[1]  Plaintiff Plazza initially registered with Airbnb on August 21, 2011, and created a second account on October 2, 2014.  (Plazza Decl. ¶ 2; Miller Decl. ¶¶ 6–9.)[2]  Plaintiffs allege that by creating and maintaining a website that lists, advertises, and takes fees or commissions for property rentals posted by individual members on the site, Airbnb is acting as an unlicensed real estate broker in violation of New York Real Property Law § 440, *et seq*.  (Compl. ¶¶ 2–4.)[3]  Plaintiffs assert that in this way Airbnb avoids being subject to the laws governing real estate brokers, and "place[s] itself in the position of sole arbiter and decision-maker in all member disputes and vests itself with complete discretion with regard to the fees and commissions its [sic] takes as well as the distribution of rental payments it processes."  (*Id.* ¶ 7.)  Plaintiffs allege that Airbnb's actions and behavior are "deceptive and fraudulent" and result in actual harm to Airbnb's members.  (*Id.* ¶ 8.)  Plaintiffs bring this putative class action on behalf of themselves and all similarly situated individuals who "[p]aid any fee, commission, or rent to Airbnb for the purpose of listing and/or renting real property, including apartments, co-ops, condominiums, and houses, within the State of New York within the six year period preceding the filing of the complaint in this action."  (*Id.* ¶ 17.)  Specifically,

---

[1] "Naude Decl." refers to the August 20, 2016 Declaration of Sylvie Naude, Exhibit L to the August 22, 2016 Declaration of Jeffrey M. Norton, (Doc. 23), filed in support of Plaintiffs' Opposition to Defendant's Motion to Compel Arbitration.  "Miller Decl." refers to the July 22, 2016 Declaration of Kyle Miller, (Doc. 21), filed in support of Defendant's Motion to Compel Arbitration.

[2] "Plazza Decl." refers to the August 20, 2016 Declaration of Francesco Plazza, Exhibit M to the August 22, 2016 Declaration of Jeffrey M. Norton, (Doc. 23), filed in support of Plaintiffs' Opposition to Defendant's Motion to Compel Arbitration.

[3] "Compl." refers to the Complaint filed in this action on February 11, 2016.  (Doc. 1.)

Plaintiffs claim violations under New York Real Property Law § 440, *et seq.*, deceptive trade practices under New York General Business Law § 349, fraud, and unjust enrichment. (*Id.* ¶¶ 47–73.)

### B. *Defendant's Terms of Service*

Since at least 2009, in order to use Airbnb's online platform, Hosts (third parties who offer their accommodations on Airbnb's website) and Guests (third parties who book such accommodations) have been required to create an account. (Miller Decl. ¶¶ 2, 4; *see also* Naude Decl. ¶ 3; Plazza Decl. ¶ 2.)[4] It is implied, and I assume in connection with my consideration of this motion, that the 2009 Terms of Service ("TOS") did not contain an arbitration clause. (*See* Miller Decl. ¶¶ 11, 13; Def.'s Mem. 6; Pls.' Mem. 6.)[5] However, since 2009 Airbnb has modified its TOS numerous times, and since August 15, 2011, the TOS includes a mandatory arbitration provision with a class action waiver. (Miller Decl. ¶¶ 11, 13; Pls.' Mem. 6–11.)[6] The TOS modifications have effective dates of August 15, 2011, May 22, 2012, April 7, 2014, June 30, 2014, and July 6, 2015. (Miller Decl. ¶ 11, Exs. 4–8.) During each of these years, the arbitration provision in the TOS reads as follows:

> You and Airbnb agree that any dispute, claim or controversy arising out of or

---

[4] Although Plaintiffs assert that Miller's declaration is "unreliable" and otherwise state that they do not concede that the screens presented by Miller "are accurate representations of the sign up screens presented to them," (Pls.' Mem. 12, 16 n.11), I do not agree that Miller's failure to include an alternative sign-up screen from 2016, a screen that itself was not tied to the date Plaintiffs accessed the site, is reason to disregard his entire declaration. In fact, even if I were to evaluate Plaintiffs' 2016 sign-up screen as the operative screen that appeared when Plaintiffs first registered for their accounts, this would not change my analysis of either the impact of the Terms of Service modifications—the content of which Plaintiffs do not dispute—or the notice provided to Plaintiff Plazza by the initial sign-up. "Pls.' Mem." refers to Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion to Compel Arbitration, filed on August 22, 2016. (Doc. 22.)

[5] "Def.'s Mem." refers to Defendant's Memorandum of Law in Support of Defendant's Motion to Compel Arbitration, filed on July 22, 2016. (Doc. 19.)

[6] Although Defendant did not provide a copy of the 2009 TOS, the August 15, 2011 version of the TOS contained a modification provision reserving to Airbnb the right to modify the TOS and informing users that "[i]f the modified Terms are not acceptable to you, your only recourse is to cease using the Site, Application and Services." (Miller Decl. Ex. 4.)

relating to these Terms or the breach, termination, enforcement, interpretation or validity thereof, or to the use of the Services or use of the Site or Application (collectively, "**Disputes**") will be settled by binding arbitration, except that each party retains the right to seek injunctive or other equitable relief in a court of competent jurisdiction to prevent the actual or threatened infringement, misappropriation or violation of a party's copyrights, trademarks, trade secrets, patents, or other intellectual property rights.  You acknowledge and agree that you and Airbnb are each waiving the right to a trial by jury or to participate as a plaintiff or class member in any purported class action or representative proceeding. Further, unless both you and Airbnb otherwise agree in writing, the arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of any class or representative proceeding.

(*Id.* ¶ 13, Exs. 4–8.)[7]  The arbitration provision also includes paragraphs addressing the arbitration rules and governing law, arbitration process, arbitration location and procedure, arbitrator's decision, and the responsibility for paying any arbitration-related fees.  (*Id.* Exs. 4–8.)[8]  Additionally, the initial paragraphs of the TOS state that "[b]y using the Site and Application, you agree to comply with and be legally bound by the terms and conditions of these Terms of Service."  (*Id.*)[9]  As of May 22, 2012, the TOS was also preceded by a capitalized admonition to users to

> PLEASE READ THESE TERMS OF SERVICE CAREFULLY AS THEY CONTAIN IMPORTANT INFORMATION REGARDING YOUR LEGAL RIGHTS, REMEDIES AND OBLIGATIONS.  THESE INCLUDE VARIOUS LIMITATIONS AND EXCLUSIONS, A CLAUSE THAT GOVERNS THE JURISDICTION AND VENUE OF DISPUTES . . . .

---

[7] Although the May 22, 2012 version of the TOS inexplicably removed the clause "except that each party retains the right to seek injunctive or other equitable relief . . . or other intellectual property rights," (Miller Decl. Ex. 5), this clause returned to the TOS with precisely the same wording in the April 7, 2014 version, (*id.* Ex. 6).

[8] Plaintiffs note that the later versions of the TOS refer to the Supplementary Procedures for Consumer Related Disputes, notwithstanding that those procedures were no longer in effect as of September 1, 2014.  (Norton Decl. ¶ 5.)  Although this apparent error does not alter the legal analysis, I note that I find an agreement to arbitrate based on events occurring prior to September 1, 2014.

[9] One difference exists between this wording, which was present in the August 15, 2011, May 22, 2012, April 7, 2014, and July 6, 2015 versions of the TOS, and the wording in the June 30, 2014 version of the TOS.  This difference is not material to my consideration of the current motion.

(*Id.* Exs. 5–8.)[10]

According to Airbnb's archived computer code, as of 2009, the sign-up screen for potential users included a sentence, directly below the sign-up button, stating that "By clicking 'Sign Up,' you confirm that you accept the <u>Terms of Service</u>."  (*Id.* ¶ 5, Ex. 1.)[11]  The TOS were hyperlinked, and there was one other hyperlink allowing existing members to sign in.  (*Id.*)  As of August 21, 2011, Airbnb presented users with one of two possible alternate sign-up screens.  (*Id.* ¶¶ 6–7, Ex. 2.)  The first allowed potential users to either "Connect with Facebook" or "<u>Create an account with your email address</u>."  (*Id.* Ex. 2.)  The phrase "<u>[c]reate an account with your email address</u>" was hyperlinked.  (*Id.*)  Below those two options was a sentence stating that "By clicking 'Connect with Facebook,' you confirm that you accept the <u>Terms of Service</u>."  (*Id.*)  The phrase "<u>Terms of Service</u>" was in blue text and underlined, indicating a hyperlink.  (*Id.*)  The second alternate screen similarly presented users with two options; however, users could now click a button stating "Connect with Facebook" or input their first name, last name, email address, password, and password confirmation prior to clicking on a button stating "Create Account."  (*Id.*)  Above the button "Connect with Facebook" was text stating "Sign up using Facebook."  (*Id.*)  Directly underneath the two options was text stating "By clicking 'Sign Up' or 'Connect with Facebook,' you confirm that you accept the Terms of Service."  (*Id.*)  "Terms of Service" was in blue text, indicating a hyperlink.  (*Id.*)  There was one other hyperlink allowing

---

[10] Certain differences exist between this wording, which was present in the April 7, 2014, June 30, 2014, and July 6, 2015 versions of the TOS, and the wording in the May 22, 2012 version of the TOS.  These differences are not material to my consideration of the current motion.

[11] Although Plaintiffs submit that the wireframe images are "inaccurate or, at least, misleading," they do so based only on the fact that Plaintiffs' counsel was able to retrieve a screenshot of an alternate sign-up screen in 2016.  (Pls.' Mem. 12.)  Therefore, Plaintiffs conclude that there is no way to state with "any degree of certainty which sign-in screen Plaintiffs viewed."  (*Id.*)  This argument is not compelling.  The availability of an alternate sign-up screen does not mean that the archived sign-up screens attached to the Miller declaration are either made up or inaccurate.

existing members to sign in.  (*Id.*)  Finally, as of October 2, 2014, although the two alternate

sign-up screens now allowed three methods of signing up, including "Sign up with Facebook,"

"Sign up with Google" or "Sign up with Email,"[12] they still noted that "[b]y signing up," the user

"agree[s] to Airbnb's <u>Terms of Service</u>, <u>Privacy Policy</u>, <u>Guest Refund Policy</u>, and <u>Host

Guarantee Terms</u>."  (*Id.* ¶¶ 8–9, Ex. 3.)  The Terms of Service, Privacy Policy, Guest Refund

Policy, and Host Guarantee Terms were all separately hyperlinked.  (*Id.*)

      Plaintiffs further referenced, and presented in advance of an April 28, 2016 conference in

this matter, a "screenshot" of a 2016 sign-up screen.  (Norton Decl. ¶¶ 2–4, Ex. A; Pls.' Pre-Mot.

Letter.)[13]  This sign-up screen displayed three options for signing up—"Continue with

Facebook," "Continue with Google," or "Sign up with Email"—and included, underneath the

third option, the sentence stating that "[b]y signing up, I agree to Airbnb's Terms of Service,

Privacy Policy, Guest Refund Policy, and Host Guarantee Terms."  (Norton Decl. Ex. A; Pls.'

Pre-Mot. Letter.)  As with the other sign-up screens, the TOS and other documents were

separately hyperlinked.  (*Id.*)

      Quite apart from the initial sign-up process, Airbnb presented its modified TOS to users

the first time they attempted to log in to their Airbnb accounts after the particular modified TOS

took effect.  (Miller Decl. ¶ 16.)  Users were required to accept the modified TOS prior to

accessing any part of the Airbnb platform.  (*Id.*; *see* Naude Decl. ¶ 7; Plazza Decl. ¶ 6.)  Airbnb

terms these acceptances "consent events."  (Miller Decl. ¶ 16.)  The 2012, 2014, and 2015

---

[12] The second alternate sign-up screen told users they could "Sign up with <u>Facebook</u> or <u>Google</u>," hyperlinking "<u>Facebook</u>" and "<u>Google</u>," or provide their first name, last name, email address, password, and password confirmation, and thereafter click a red button stating "Sign up."  (Miller Decl. Ex. 3.)  Again, directly above the red "Sign up" button was the text "By signing up, I agree to Airbnb's <u>Terms of Service</u>, <u>Privacy Policy</u>, <u>Guest Refund Policy</u>, and <u>Host Guarantee Terms</u>."  (*Id.*)  The Terms of Service, Privacy Policy, Guest Refund Policy, and Host Guarantee Terms were all separately hyperlinked.  (*Id.*)

[13] "Pls.' Pre-Mot. Letter" refers to the March 31, 2016 letter submitted to me in advance of the April 28, 2016 pre-motion conference.  (Doc. 10.)

modifications of the TOS each presented Airbnb users with a screen box titled either "Updated Terms of Service and Privacy Policy," "Terms of Service," or "Updated Terms of Service." (*Id.* Exs. 9–11.) Below the title was a short paragraph notifying users that Airbnb recently updated its terms. (*Id.*) In that introductory paragraph, the 2014 and 2015 screen boxes further told users to read each term carefully and provided a hyperlink for users to "[l]earn more about what's changed." (*Id.* Exs. 10–11.) Below the introductory paragraph, each screen box provided a scrollable version of the TOS and tabs to the other relevant agreements that had been modified. (*Id.* Exs. 9–11.) Finally, each screen box required users, underneath the scrollable TOS, both to click a check box next to text stating "I agree to the terms and conditions of the updated Terms of Service" or other similar language, and to click a red button reading "I Agree" or "Agree." (*Id.* ¶¶ 17–19, Exs. 9–11.)

Airbnb's records indicate that Plaintiff Naude "consented" to the TOS on July 29, 2009, May 23, 2012, May 7, 2014, and August 16, 2015. (*Id.* ¶¶ 21–23, Exs. 17–19.) Similarly, Airbnb's records indicate that Plaintiff Plazza "consented" to the TOS on August 21, 2011, May 22, 2012, May 30, 2014, and November 22, 2015 under his first account, and on October 2, 2014 and August 6, 2015 under his second account. (*Id.* ¶¶ 21–22, 24, Exs. 17–19.) In addition to the modification screens, Airbnb's records indicate that since 2014, Plaintiffs would have received emails after these modifications were enacted notifying Plaintiffs of the TOS modifications and providing links to explanations of those changes as well as the old and new versions of the TOS itself. (*Id.* ¶ 20, Exs. 12–16.) Plaintiffs provided copies of emails sent to Plaintiff Naude on July 10, 2015 and March 30, 2016, and to Plaintiff Plazza on March 31, 2016, which informed Plaintiffs in the subject line that "We're updating our Terms of Service and Privacy Policy," informed Plaintiffs that they would be asked to agree to these terms upon using the site, and

linked to information explaining the changes as well as old and new versions of the TOS. (Nadler Decl. ¶¶ 2–4, Exs. A–C.)[14]

Plaintiffs do not appear to dispute the accuracy of the modification and email records, (*see* Pls.' Mem. 7–10),[15] but rather indicate a lack of recollection as to certain facts related to the initial sign-up process. Specifically, Plaintiff Naude does not recall seeing, being provided with, or being required to agree to Airbnb's TOS during the initial registration process or at any point between 2009 and 2012. (Naude Decl. ¶¶ 4–5.) Plaintiff Naude does, however, recall "visiting the Airbnb site and being required to click a button indicating that [she] accept[s] Airbnb's updated Terms of Service and other policies" on "at least one occasion." (*Id.* ¶ 7.) Plaintiff Naude did not read the TOS. (*Id.*) Finally, with respect to the emails, Plaintiff Naude acknowledges receipt of email "notices that Airbnb had updated its Terms of Service" and accurately notes that the emails did not explicitly inform users of the arbitration provision and class action waiver. (*Id.* ¶ 9; Miller Decl. Exs. 12, 14.)

Plaintiff Plazza similarly has "no specific recollection of either seeing the Terms of Service hyperlink or any statement" noting his agreement to the TOS before setting up his accounts. (Plazza Decl. ¶ 3.) Plaintiff Plazza further notes that while creating his accounts, he was not actually presented with the TOS, and was able to enter the site without clicking on an actual button reading "I Agree." (*Id.* ¶ 4.) Plaintiff Plazza does recall being required to click such a button "[o]n several occasions" after he created his accounts, but also indicates that he did

---

[14] "Nadler Decl." refers to the July 22, 2016 Declaration of Michael L. Nadler filed in support of Defendant's Motion to Compel Arbitration. (Doc. 20.)

[15] Plaintiffs point out that Plaintiff Naude's August 16, 2015 "consent" purportedly occurred despite the fact that she claims to have been restricted from using her Airbnb account in March 2014, but do not otherwise dispute the validity of that record. (Pls.' Mem. 11.) If Plaintiff Naude was restricted from using her Airbnb account in March 2014 and has not had any transactions through her Airbnb account since that time, (Naude Decl. ¶ 8), then it could be argued that she would not have standing to bring any claims after March 2014 and would not be an adequate class representative for any class members with claims accruing after March 2014.

not read the TOS.  (*Id.* ¶ 6.)  Finally, like Plaintiff Naude, Plaintiff Plazza acknowledges receipt of email "notices that Airbnb had updated its Terms of Service," but likewise reiterates that the emails did not explicitly inform him of the arbitration provision and class action waiver.  (*Id.* ¶ 7; *see also* Miller Decl. Exs. 13, 15–16.)

## II.  <u>Procedural History</u>

Plaintiffs filed their putative class action complaint on February 11, 2016, claiming violations under New York Real Property Law § 440, *et seq*., deceptive trade practices under New York General Business Law § 349, fraud, and unjust enrichment.  (Compl. ¶¶ 47–73.)  In accordance with my Individual Rules, on March 28, 2016, Defendant filed a letter that requested a pre-motion conference on its anticipated motion to compel arbitration and outlined the basis for such a motion.  (Doc. 8.)  Defendant filed a letter with supplemental authority on March 29, 2016.  (Doc. 9.)  On March 31, 2016, Plaintiffs responded to this letter, (Doc. 10), and on April 28, 2016, I held a conference regarding Defendant's anticipated motion.  (*See* Doc. 14.)

On May 9, 2016, I granted the parties' joint letter proposing deadlines for discovery and motion practice.  (Doc. 13.)  On July 7, 2016, I granted the parties' stipulation requesting an extension of time in connection with the motion to compel arbitration.  (Doc. 17.)  Pursuant to that stipulation, Defendant filed its motion to compel arbitration on July 22, 2016, (Docs. 18–21), Plaintiffs filed their opposition on August 22, 2016, (Docs. 22–23), and Defendant filed its reply on September 12, 2016, (Doc. 26).  Plaintiffs filed a notice of supplemental authority on October 5, 2016, (Doc. 27), to which Defendant responded on October 11, 2016, (Doc. 28).  Defendant filed its own notice of supplemental authority on November 1, 2016, (Doc. 29), to which Plaintiffs responded on November 16, 2016, (Doc. 30).  Defendant filed an additional notice of supplemental authority on August 17, 2017, (Doc. 37), to which Plaintiffs responded on

August 18, 2017, (Doc. 38). Defendants filed a reply to Plaintiffs' letter that same day, (Doc. 39), and Plaintiffs filed a response on August 30, 2017, which provided an update noting that the Second Circuit had denied without prejudice a motion to amend its decision in *Meyer v. Uber Technologies, Inc.*, 868 F.3d 66 (2d Cir. 2017), (Doc. 40), which was the subject of Defendant's notice of supplemental authority filed on August 17, (Doc. 37).

### III. <u>Legal Standard</u>

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, provides that an arbitration provision in a "contract evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. In creating "a body of federal substantive law of arbitrability, applicable to any arbitration agreement with [its] coverage," the FAA was "a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983); *see also AT & T Mobility LLC v. Concepcion*, 563 U.S. 333, 346 (2011) ("[O]ur cases place beyond dispute that the FAA was designed to promote arbitration. They have repeatedly described the Act as 'embod[ying] [a] national policy favoring arbitration,' . . . .") (alteration in original) (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006)). The "'principal purpose' of the FAA is to 'ensur[e] that private arbitration agreements are enforced according to their terms.'" *Concepcion*, 563 U.S. at 344 (citations omitted). Notwithstanding the strong policy in favor of arbitration agreements, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 127 (2d Cir. 2011) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)); *see also*

*Concepcion*, 563 U.S. at 339 ("[C]ourts must place arbitration agreements on an equal footing with other contracts, and enforce them according to their terms.") (internal citations omitted).

In determining whether claims are subject to arbitration, courts in this Circuit consider "(1) whether the parties have entered into a valid agreement to arbitrate, and if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement." *In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d at 128 (citations omitted). If these two conditions are met, the FAA "mandates that district courts *shall* direct the parties to proceed to arbitration." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original). When deciding motions to compel, courts apply a standard similar to that applied in considering a motion for summary judgment, necessitating a consideration of "all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits" and drawing all inferences in favor of the non-moving party. *Nicosia v. Amazon.com Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 155 (2d Cir. 2002) (internal quotation marks omitted)). If there exists a genuine issue of material fact as to whether the parties entered the agreement, a trial "is warranted." *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012) (citation omitted).

When determining whether the parties have entered into a valid agreement to arbitrate, "courts 'should apply ordinary state-law principles that govern the formation of contract,'" and evaluate the allegations "to determine whether they raise a genuine issue of material fact." *Sacchi v. Verizon Online LLC*, No. 14-CV-423, 2015 WL 765940, at *4 (S.D.N.Y. Feb. 23, 2015) (citations omitted). Defendant in this action submits that Airbnb's TOS contains a choice of law provision that provides that its agreement will be governed by California law, and Plaintiffs do not appear to contest this position. (Def.'s Mem. 5; Def.'s Reply Mem. 6; *see*

*generally* Pls.' Mem.)[16]  In any event, both California and New York, the state in which

Plaintiffs reside, apply substantively similar law with respect to contract formation.  *See, e.g.*,

*Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014); *Be In, Inc. v. Google Inc.*,

No. 12-CV-03373, 2013 WL 5568706, at *6 (N.D. Cal. Oct. 9, 2013).

IV.    **Discussion**

A.    ***The Agreement to Arbitrate***

Although the Internet age has certainly introduced new twists with regard to entering into

contracts, the fundamental elements of contract law, including mutual assent of the parties, have

not changed.  *Meyer*, 868 F.3d at 75.  Assent may take the form of "words or silence, action or

inaction, but '[t]he conduct of a party is not effective as a manifestation of his assent unless he

intends to engage in the conduct and knows or has reason to know that the other party may infer

from his conduct that he assents.'"  *Schnabel*, 697 F.3d at 120 (quoting Restatement (Second) of

Contracts § 19(2)) (alteration in original).  A person can manifest assent to contractual terms

even without actual notice of those terms.  *See id.*

Here, both Plaintiffs in this action claim that they did not read Airbnb's TOS and, as

such, actual notice of the arbitration provision at issue in this case is not present.  However,

Plaintiffs can still be bound by the contractual terms if there is inquiry notice of the terms and

Plaintiffs "assent[ed] to [the terms] through the conduct that a reasonable person would

understand to constitute assent."  *Id.*; *see also Nicosia*, 834 F.3d at 233.  A person is on inquiry

notice if a "reasonably prudent offeree would be on notice of the terms at issue."  *Schnabel*, 697

F.3d at 120 ("'[I]nquiry notice' is 'actual notice of circumstances sufficient to put a prudent man

---

[16] "Def.'s Reply Mem." refers to Defendant's Corrected Reply Memorandum of Law in Support of its Motion to Compel Arbitration.  (Doc. 26.)

upon inquiry.'" (quoting *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 27 n.14 (2d Cir. 2002))).

The scenario of notice given through terms of service drafted unilaterally and presented to an Internet user online is not unique, and has been the subject of an abundance of case law addressing what is required in these circumstances to find reasonable notice of and assent to those terms. Of notable, but not necessarily outcome determinative, importance is the distinction between what have been dubbed "clickwrap" and "browsewrap" agreements. Clickwrap agreements are generally defined by the requirement that users "click" some form of "I agree" after being presented with a list of terms and conditions. *See, e.g.*, *Nicosia*, 834 F.3d at 233; *Whitt v. Prosper Funding LLC*, No. 15-CV-136, 2015 WL 4254062, at *1, *4 (S.D.N.Y. July 14, 2015) (finding a clickwrap agreement valid and enforceable where the website required applicants to click on a box adjacent to text noting that clicking on the box constituted acceptance of certain agreements); *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 837–38 (S.D.N.Y. 2012); *Long v. Provide Commerce, Inc.*, 200 Cal. Rptr. 3d 117, 122–23 (Ct. App. 2016). Browsewrap agreements, on the other hand, are usually found "where a website's terms and conditions are . . . posted on the website via a hyperlink at the bottom of the screen" and a user's assent is given merely by his or her use of the website and nothing more. *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1176 (9th Cir. 2014). Although clickwraps present a far simpler determination for a court given the express and unambiguous manifestation of assent through the "click" of an "I accept" button, courts have also found browsewrap agreements valid and enforceable so long as there is some form of reasonably conspicuous notice. *See id.* at 1176–78 (listing cases). In other words, browsewrap agreements are not presumptively unenforceable.

Plaintiffs acknowledge that Airbnb's modified versions of its TOS were presented to them in what "appear to be" clickwrap form. (Pls.' Mem. 16–17.) However, Plaintiffs maintain that the screens were insufficient notice because they did not directly refer to the arbitration provision, nor did the emails concurrently sent after the 2014 and 2015 modifications advise users of the arbitration provision. (*Id.* at 17–18.) These facts alone do not mandate a finding that there is no notice, and the other facts present do support the conclusion that there was a valid agreement to arbitrate. Specifically, after modifying the TOS, Airbnb provided the modified TOS to users the first time that any user tried to access his or her account after the modified TOS took effect. (Miller Decl. ¶ 16.) During those times, Airbnb presented an actual scroll box with the modified TOS and would not allow users to access any part of Airbnb's website or continue using the platform until they indicated their assent to the TOS. (*Id.*; *see also* Naude Decl. ¶ 7; Plazza Decl. ¶ 6.) At the very top of the modified TOS was text warning users to "READ THE TERMS CAREFULLY" as they contained important legal information, including a clause governing "JURISDICTION AND VENUE OF DISPUTES." (Miller Decl. Exs. 5–8, 10–11.)[17] Moreover, the evidence establishes that directly underneath the scroll box, users had to click on two buttons manifesting assent: a check box with the text "I agree to the terms and conditions of the updated Terms of Service [and other terms]," and a red button right below it, with white text, reading "I Agree" or "Agree." (*Id.* Exs. 9–11.) These facts combine to form the very circumstances under which courts *have* found notice and a manifestation of assent.[18] *See, e.g.,*

---

[17] Although the same warning does not appear in the screenshot of the May 22, 2012 scroll-through box attached as Exhibit 9 to the Miller declaration, the same sentence does appear in the actual May 22, 2012 TOS, attached as Exhibit 5 to the Miller declaration.

[18] These facts further distinguish this case from the single case cited by Plaintiffs, a Maryland decision that is not binding on me. *See DirecTV v. Mattingly*, 829 A.2d 626, 628 (Md. 2003) (finding failure to provide sufficient notice when petitioner did not "discuss, mention, or even highlight any change in the customer agreement," which was in turn required by the notice provisions of the initial customer agreement).

*Specht v. Netscape Commc'ns Corp.*, 150 F. Supp. 2d 585, 594 (S.D.N.Y. 2001), *aff'd,* 306 F.3d 17 (2d Cir. 2002) ("The few courts that have had occasion to consider click-wrap contracts have held them to be valid and enforceable."); *Whitt*, 2015 WL 4254062 at *1, *4 (finding, notwithstanding the need to click on a hyperlink to access the terms, that a website requiring applicants to click on a box adjacent to text noting that clicking on the box was an acceptance of the agreement was a clickwrap agreement, and "[i]n New York, clickwrap agreements are valid and enforceable contracts").

Although both parties agree that the 2009 TOS, operative when Plaintiff Naude first created her account, did not include an arbitration provision, Airbnb has presented evidence that Plaintiff Naude accessed her account, and therefore was presented with the modified TOS containing the arbitration clause, on May 23, 2012.[19] (Miller Decl. Exs. 17–18.) Following subsequent modifications, she was again presented with the TOS upon accessing her account in 2014 and 2015. (*Id.* ¶¶ 21–23, Exs. 17–18.) Indeed, Plaintiff Naude admits that she recalls "[o]n at least one occasion . . . being required to click a button indicating [acceptance of] Airbnb's updated Terms of Service and other policies." (Naude Decl. ¶ 7.) Similarly, Plaintiff Plazza recalls that on "several occasions" after he created his accounts, he was "required to click a button indicating that [he accepted] Airbnb's updated Terms of Service and other policies." (Plazza Decl. ¶ 6.) In addition, Airbnb presents evidence that Plaintiff Plazza accessed one of his two accounts and was required to accept the modified TOS on May 22, 2012, May 30, 2014,

---

[19] Although Plaintiffs do not recall certain facts related to seeing, being provided with, or being required to agree to Airbnb's TOS during the initial registration process or at certain points thereafter, (Naude Decl. ¶¶ 4–5; Plazza Decl. ¶ 3), Plaintiffs' lack of recollection does not create a meaningful dispute of fact. *Cf. Moule v. United Parcel Serv. Co.*, No. 16-CV-00102-JLT, 2016 WL 3648961, at *7 (E.D. Cal. July 7, 2016) ("Significantly, under California law, Plaintiff cannot avoid the terms of a contract by asserting a representative failed to read the UPS Terms when provided with an opportunity to do so, or that he does not recall receiving notice of the UPS Terms."); *Gonder v. Dollar Tree Stores, Inc.*, 144 F. Supp. 3d 522, 528 (S.D.N.Y. 2015) ("A mere assertion that one does not recall signing a document does not, by itself, create an issue of fact as to whether a signature on a document is valid—especially in the absence of any evidence the document was fabricated.").

August 6, 2015, and November 22, 2015.  (Miller Decl. ¶ 24, Exs. 17–18.)

The emails sent by Airbnb to its users upon the modification of the TOS in 2014 and 2015 are yet another form of notice provided to Plaintiffs.  While the subject lines of these emails are not apparent from the exhibits attached by Airbnb to the Miller declaration, (*id.* Exs. 12–16), the 2015 and 2016 emails actually sent to Plaintiffs and attached to the Nadler declaration clearly state in the subject line that Airbnb is "updating [its] Terms of Service and Privacy Policy," (Nadler Decl. Exs. A–C).  Moreover, the substance of the emails notified users that Airbnb had updated its Terms of Service, hyperlinked a page explaining the changes, and hyperlinked a page where the TOS could be found.  (Miller Decl. Exs. 12–16; Nadler Decl. Exs. A–C.)  Even without the evidence provided by Airbnb, Plaintiffs both acknowledge receiving emails with "notices that Airbnb had updated its Terms of Service."  (Naude Decl. ¶ 9; Plazza Decl. ¶ 7.)  Certainly when combined with the clickwrap modified agreements, these emails gave inquiry notice of Airbnb's arbitration provision.  *See Starkey v. G Adventures, Inc.*, 796 F.3d 193, 195–97 (2d Cir. 2015) (finding that emails containing a hyperlink and language advising plaintiff to click on the hyperlink sufficiently directed the plaintiff's notice to the terms and conditions); *Sacchi*, 2015 WL 765940, at *3 (finding that there was sufficient notice for an amended agreement newly inserting arbitration term when it was posted to Verizon's website and also referred to in an email sent to Plaintiff);[20] *cf. Schnabel*, 697 F.3d at 123 & n.14 (finding insufficient notice by email that was sent after enrollment in a service of an online consumer

---

[20] I note that *Sacchi* involved an email where the body of the email referred to the arbitration provision, whereas Airbnb's emails did not refer to the arbitration clause.  However, like *Sacchi*, Airbnb's subject line clearly indicated the content of the emails and, in any event, the Court in *Sacchi* mitigated the import of the above-mentioned distinction when finding that, with respect to the argument that the notices failed to mention the ban on class-wide arbitration, "[n]otice of the terms of the agreement is sufficient where the offeree is given 'adequate notice of the existence of additional documents' that contain those terms."  2015 WL 765940, at *8 (citations omitted) (applying New Jersey law).  Moreover, *Sacchi* involved a case where assent was based simply on continued acceptance of the services, and did *not* involve a plaintiff who expressly consented to the modified terms by clicking "I agree" after being presented with those terms.

business, which presented an unclear subject line without mention of the terms and twelve paragraphs of membership and benefits information in the body of the email before reciting the terms of service). The fact that Plaintiffs failed to actually read the TOS on those occasions, or on any other occasion, does not help them. *See, e.g.*, *Specht*, 306 F.3d at 30 ("It is true that '[a] party cannot avoid the terms of a contract on the ground that he or she failed to read it before signing.'" (alteration in original) (quoting *Marin Storage & Trucking, Inc. v. Benco Contracting & Eng'g, Inc.*, 107 Cal. Rptr. 2d 645, 651 (Ct. App. 2001)));[21] *see also Starkey*, 796 F.3d 193 (finding, notwithstanding plaintiff's claim that she never clicked on the hyperlinks or read the terms, that emails sufficiently directed her attention to the terms vis-à-vis the hyperlink and language advising her to click on the hyperlink).

Given that Airbnb's broad arbitration clause applies retroactively, the arbitration clauses in the modified versions of the TOS are sufficient to govern this dispute and refer the entire matter to arbitration, including any claims of Plaintiff Naude that arose when she first signed up for Airbnb in 2009 prior to the incorporation of any arbitration provision.[22] *See Sacchi*, 2015 WL 765940, at *9 ("Courts generally 'give retroactive application to broad arbitration

---

[21] Although the Court in *Specht* noted an exception when the writing does not appear to be a contract and the terms are not called to the attention of the recipient, the Court found that the contractual nature was not obvious specifically because the plaintiffs were responding to an offer that "did not carry an immediately visible notice of the existence of license terms or require unambiguous manifestation of assent to those terms," 306 F.3d at 31, which are not the circumstances present here. To the contrary, Airbnb's screens clearly presented the TOS and Airbnb even informed its users numerous times that the TOS affected their legal rights, most particularly in the scrollable screens presented after the TOS was modified. (*See, e.g.*, Miller Decl. Exs. 5–11.) Moreover, and contrary to the Plaintiffs' arguments, (Pls.' Mem. 20), courts have found the phrase "Terms of Service" sufficient to indicate notice of a contract. *See, e.g.*, *Meyer*, 868 F.3d at 79 (enforcing arbitration clause found in Terms of Service indicated by hyperlink); *Fteja*, 841 F. Supp. 2d 829 (same). The cases cited by Plaintiffs are not to the contrary, but rather indicate that the hyperlink is not enough in and of itself to notify a user of the terms. *See, e.g.*, *Long*, 200 Cal. Rptr. 3d at 127 (noting that the hyperlink "may" not be enough to alert a reasonably prudent user to click on it). In any event, unlike the cases cited by Plaintiffs, the phrase "Terms of Service" was only hyperlinked next to other policies and terms in the sign-up page beginning in 2014, which is after the time period that Plaintiffs both signed up for their initial accounts and agreed to modifications. (Miller Decl. Exs. 1–3.)

[22] I note that Defendant only briefly addresses whether the scope of the arbitration clause encompasses the claims alleged by Plaintiffs, (Def.'s Mem. 10), and Plaintiffs do not address the issue at all. In any event, I find that Defendant's broadly worded arbitration provision does cover this dispute.

clauses . . . .'" (citation omitted)).  Each version of the TOS between 2011 and 2015 contained a

broadly worded arbitration clause stating that "*any dispute, claim or controversy* arising out of or

relating to these Terms or the breach, termination, enforcement, interpretation or validity

thereof . . . will be settled by binding arbitration."  (Miller Decl. ¶ 13, Exs. 4–8 (emphasis

added).)  Courts have held that arbitration clauses with similarly broad language apply

retroactively.  *See Sacchi*, 2015 WL 765940, at *9 (holding that "[t]he Second Circuit has held

that an arbitration clause that applied by its terms to 'any controversy' between members covered

claims that accrued before the members entered into the agreement" (quoting *Coenen v. R.W.*

*Pressprich & Co.*, 453 F.2d 1209, 1212 (2d Cir. 1972))); *see also Smith/Enron Cogeneration*

*Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 99 (2d Cir. 1999).[23]

Even without the notice provided after the terms of service were modified, I find that

Airbnb's original sign-up procedure was sufficient inquiry notice of the terms of service which—

at least during the time that Plaintiff Plazza created his account—included an arbitration

provision.  As Plaintiff Naude signed up during a time when the TOS did not include the

arbitration provision, I do not look to the circumstances surrounding her initial sign-up, but

rather consider only the notice provided during Plaintiff Plazza's initial sign-up for his first

account in 2011.[24]  Although Plaintiffs and Defendant disagree about whether the initial sign-up

procedure established a "clickwrap" or "browsewrap" agreement, I do not have to determine in

---

[23] Although the *Smith/Enron* case was distinguished by the Second Circuit later on, the Court there merely noted that
it would not read an arbitration clause to have an expansive temporal scope without looking first at whether the
parties intended the arbitration clause to cover the dispute, and ultimately found in the negative because the parties'
contractual positions and relationship had changed over time in a way that impacted arbitrability.  *See Holick v.*
*Cellular Sales of N.Y., LLC*, 802 F.3d 391, 398 (2d Cir. 2015); *see also Lai Chan v. Chinese-Am. Planning Council*
*Home Attendant Program, Inc.*, No. 15-CV-9605, 2016 WL 3004518, at *4–5 (S.D.N.Y. Apr. 8, 2016)
(distinguishing *Holick*, including on the grounds that the agreement did not alter the plaintiffs' employment status in
a manner indicative of the parties' intent such that a line should be drawn between the time periods).

[24] However, the same reasoning applied here applies to any evaluation of the notice provided during the other sign-
up periods identified by the parties in their papers.

which specific bucket the original presentation of the TOS falls in order to determine that Plaintiff Plazza had notice of the arbitration provision.

Nevertheless, I note that while Airbnb's initial sign-up procedure was not a classic clickwrap in the sense that the terms were presented by hyperlink instead of being shown to the user and there was no clear button affirmatively stating "I accept," it also was not a "true browsewrap" either. The resulting "hybrid agreement" weighs in favor of valid notice, as courts have generally been "more willing to find the requisite notice for constructive assent where the browsewrap agreement resembles a clickwrap agreement—that is, where the user is required to affirmatively acknowledge the agreement before proceeding with use of the website." *Nguyen*, 763 F.3d at 1176–77 (citing *Zaltz v. JDATE*, 952 F. Supp. 2d 439, 451–52 (E.D.N.Y. 2013)); *see also Fteja*, 841 F. Supp. 2d at 838–40 (explaining, using Judge Leval's oft-quoted analogy in *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 401 (2d Cir. 2004), that the situation was like one in which a website maintains a "roadside fruit stand displaying binds of apples," and there are signs saying that "[b]y picking up this apple, you consent to the terms of sale by this fruit stand. For those terms, turn over the sign," and noting that in those circumstances "courts have not hesitated in applying the terms against the purchaser"); *Swift*, 805 F. Supp. 2d at 911–12 ("Cases addressing modified clickwrap agreements more similar to the one at issue here, where a plaintiff was provided notice and an opportunity to review terms of service prior to acceptance, have held them sufficient to put a plaintiff on notice of the terms to which she was assenting.").

In making the ultimate determination that Airbnb provided inquiry notice during Plaintiff Plazza's initial sign-up, I look to "whether the design and content of [the] webpage rendered the existence of the terms reasonably conspicuous." *Nicosia*, 834 F.3d at 233. Here, the design and content of the website are such that Plaintiff Plazza was on reasonably conspicuous notice of the

arbitration provision.

Plaintiff Plazza signed up for his first account on August 21, 2011. (Miller Decl. ¶ 7.) Depending on the algorithm assigned to the particular user, on the date that Plaintiff Plazza signed up for his account, one of two screens would have appeared. (*Id.* Ex. 2.) I find that both screens contained a limited amount of text in clear font size and color. (*Id.*) In one screen, directly underneath text directing users to "Connect with Facebook" or "Create an account with your email address," written in similar, if not the same, font size was text warning users that "By clicking 'Connect with Facebook,' you confirm that you accept the Terms of Service." (*Id.*) "Terms of Service" was highlighted with blue font and an underline, indicating a hyperlink that took users directly to the TOS. Although there were two other hyperlinks on the screen, one simply informed users that they could "Create an account with your email address" and the other, which appeared in a separate box below the box allowing persons to sign up, simply allowed existing Airbnb members to "Sign In Now." (*Id.*) The second screen that Plaintiff Plazza may have seen upon signing up was substantially similar, except that instead of giving the option to "Create an account with your email address," the screen provided text boxes for users to actually insert their first name, last name, email address, password, and password confirmation. (*Id.*) Below that text was a button allowing users to "Create Account." (*Id.*) Again, underneath that text, was a sentence, in similar if not the same font size, telling users that "By clicking 'Sign Up' or 'Connect with Facebook,' you confirm that you accept the Terms of Service." (*Id.*)[25] Here again, "Terms of Service" was highlighted with blue font, indicating a hyperlink that took users directly to the TOS. (*Id.*) No other hyperlinks appeared in the immediate vicinity, other than the

---

[25] Defendant's description of the sign-up screens comport with Plaintiff Plazza's recollection that he did not have to click on a button reading "I Agree" when registering his Airbnb accounts. (Plazza Decl. ¶ 4.)

hyperlink allowing current members to sign in.  (*Id.*)[26]

These facts are easily distinguishable from those cases where browsewraps have been deemed invalid.  *Cf. Nicosia*, 834 F.3d at 237–38 (finding that reasonable minds could disagree as to the reasonableness of notice where there were between fifteen and twenty-five links on the order page, various text was displayed in at least four font sizes and six colors alongside multiple buttons and promotional advertisements, and the customers' personal address, credit card information, shipping option, and purchase summary sufficiently distracted the user from whatever effect the notification did have); *Nguyen*, 763 F.3d at 1174, 1178 & n.1 (refusing to enforce an arbitration agreement where the notice was predicated on a hyperlink located on the bottom left-hand corner of every page on the website, which appeared next to other hyperlinked terms); *Specht*, 306 F.3d at 20, 23, 29–30, 32 (finding a reasonably prudent Internet user would not have notice or manifest assent by downloading software when, to discover the existence of the TOS, the users would have to scroll down a webpage to a "submerged" screen located below the download button); *Long*, 200 Cal. Rptr. 3d at 120 (finding notice insufficient where the hyperlink was located at the bottom of each webpage, with light green typeface on lime green background, next to fourteen other capitalized and underlined hyperlinks of the same color, font, and size).[27]

---

[26] Since I find that Plaintiff Plazza had notice of the arbitration provision when he signed up for his account on August 21, 2011, I need not examine the sign-up screen that popped up when he created his second account on October 2, 2014.

[27] Plaintiffs' citation to Judge Weinstein's opinion in *Berkson v. Gogo, LLC*, 97 F. Supp. 3d 359 (E.D.N.Y. 2015), as support for their argument that notice in this case was deficient is unavailing.  In *Berkson*, Judge Weinstein derived certain general principles which permit, rather than forbid, the validity of Airbnb's TOS:  first, a TOS will not be enforced when there is "no evidence" the website user had notice; second, the TOS will be enforced if the user is encouraged by the design and content of the website and webpage to examine the terms; and third, the TOS will not be enforced where the link to the terms is "buried at the bottom of a webpage or tucked away in obscure corners where users are unlikely to see it."  *Id.* at 401–02.  Judge Weinstein further distinguished *Gogo* from another case on the grounds that Gogo did not have a practice of emailing or mailing the contents of the terms to its customers and did not make an effort to draw the plaintiff's attention to the terms, *id.* at 403, two facts that are present in the current case.

As a result of the foregoing, I find that Airbnb put Plaintiffs on reasonably conspicuous notice of the terms of the arbitration provision and that Plaintiff Plazza's actions in signing up, as well as Plaintiffs' explicit agreement to the modifications and continued use of Airbnb, manifested their assent. *See, e.g.*, *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 402–03 (2d Cir. 2004) (emphasizing that the defendant visited the computers daily, saw the terms daily, and acknowledged awareness of the terms, and further noting that the presence of an "I agree" icon is not essential in all circumstances to show assent); *Fteja*, 841 F. Supp. 2d at 835, 838–40 (enforcing forum selection clause when agreement was not a true browsewrap and the hyperlinked terms of service were next to the statement that "By clicking Sign Up, you are indicating that you have read and agree to the Terms of Service").

Plaintiffs argue in the alternative that the placement of the arbitration clause toward the end of a long agreement necessarily means that Airbnb did not provide notice. (Pls.' Mem. 18–20.) This argument is equally unpersuasive. Regardless of the placement of the arbitration clause, Plaintiffs do not dispute that, beginning in May 2012, the TOS was preceded by a capitalized admonition warning users to read the terms carefully as they contained important legal information, including a clause governing "JURISDICTION AND VENUE OF DISPUTES." (Miller Decl. Exs. 5–8.) It is also undisputed that Plaintiffs would have been confronted by that sentence when they attempted to access their respective accounts after the TOS had been modified. (*Id.* ¶¶ 16–19, Exs. 9–11; *see also* Naude Decl. ¶ 7; Plazza Decl. ¶ 6.) Moreover, in the emails sent by Airbnb and received by Plaintiffs in 2014 and 2015, Airbnb told users that they "should review the documents in full on [their] own." (Miller Decl. Exs. 12–16.) Finally, the arbitration provision could at all times be found under a bolded heading, titled "Dispute Resolution." (*Id.* Exs. 4–8.) The facts here are thus quite unlike those in the cases

cited by Plaintiffs with respect to this issue. *See, e.g.*, *Bruni v. Didion*, 73 Cal. Rptr. 3d 395 (Ct. App. 2008) (finding that an arbitration clause was an unconscionable surprise where the booklet containing the arbitration provision—which in turn was indistinguishable and part of a thirty-page paper booklet—was in turn buried in a stack of purchase and sale documents, some plaintiffs did not even receive the booklet until after signing, and the court found "most important" that the plaintiffs were not required to sign or initial the booklet, but were only asked to sign a separate, one-page application); *see also Brookdale Inn & Spa v. Certain Underwriters at Lloyds, London*, No. 13-CV-2559, 2014 WL 116442, at *3–4 (N.D. Cal. Jan. 13, 2014) (distinguishing *Bruni* and finding an arbitration clause that was no more or less prominent than the other contractual terms and appeared on page twelve of thirty-four of a policy conscionable). Indeed, the *Meyer v. Kalanick* district court case cited frequently by Plaintiffs—while also distinguishable in terms of the facts leading the district court to conclude that notice was not given, *see* 200 F. Supp. 3d 408 (S.D.N.Y. 2016)—was recently overturned by the Second Circuit, *see Meyer*, 868 F.3d at 75. In its decision, the Second Circuit found that the arbitration clause—which was found on page seven of a nine-page document and was presented via a two-step process on the mobile application—still provided "reasonably conspicuous notice." *Id.* at 77–79. In light of Plaintiffs' heavy reliance on the district court's opinion in *Meyer v. Kalanick*, its reversal considerably undermines their argument that they did not receive reasonably conspicuous notice.

### B.  *The Enforceability of the Arbitration Clause*

Notwithstanding the liberal policy favoring arbitration, the FAA still permits the invalidation of an otherwise valid arbitration clause when certain "generally applicable contract defenses, such as fraud, duress, or unconscionability" apply. *See Concepcion*, 563 U.S. at 339

(citation omitted).  Plaintiffs raise two issues they claim impact the enforceability of Airbnb's

arbitration clause:  fraudulent inducement and unconscionability.  These arguments are not

supported by the facts and are, in any event, unpersuasive.  I address each in turn below.

1.  Fraudulent Inducement of the Arbitration Provision

Plaintiffs set forth their facts supporting a fraudulent inducement claim in a single, brief

paragraph, arguing that Defendant surreptitiously inserted an arbitration provision into its TOS

materially altering the rights of users, and buried the arbitration provision deep within a

voluminous document without drawing the users' attention to that provision.  (Pls.' Mem. 21.)

Putting aside the fact that Plaintiff Plazza initially signed up for his account after the date that the

arbitration provision was added—a fact that makes Plaintiff Plazza's assertion of this argument

more flawed and unpersuasive—I find that these arguments fail with regard to both Plaintiffs.

If the claim involves fraudulent inducement of an arbitration provision as opposed to the

contract itself, a court as opposed to the arbitrator may decide the claim.  *See Buckeye*, 546 U.S.

at 445.  However, Plaintiffs do not provide any case law supporting that fraudulent inducement

exists in this case.  In fact, in the one case cited by Plaintiffs where fraudulent inducement of an

arbitration provision was found sufficiently colorable to send the parties to trial, the case

involved a standalone alternative dispute resolution document that was written in English and

given to a non-English speaking plaintiff.  *See Caseres v. Texas de Brazil (Orlando) Corp.*, No.

13-CV-1001, 2013 WL 5921539, at *1–2 (M.D. Fla. Nov. 4, 2013).  Furthermore, the court in

that case cited three cases where fraud was found, each involving improper or allegedly improper

translation of agreements.  *Id.* at *6.  Similar facts do not exist here.  The underlying facts

supporting the holdings of these courts are not surprising since a fraudulent inducement claim

must be premised on some form of actual reliance.  Here, Plaintiffs Naude and Plazza, unlike the

plaintiffs in these cases, are not relying on some faulty translation; rather, they argue that they did not even read the TOS, and do not cite to any evidence to show that Airbnb misleadingly communicated the terms of the TOS prior to Plaintiffs' signing. *See Hinesley v. Oakshade Town Ctr.*, 37 Cal. Rptr. 3d 364, 367 (Ct. App. 2005) (explaining that fraudulent inducement is a "subset of the tort of fraud," which requires a misrepresentation, scienter, intent to induce reliance, justifiable reliance, and resulting damage, and that fraudulent inducement occurs when the promisor knows what he is signing but his consent is induced by fraud). For these reasons and given that Plaintiffs' fraudulent inducement claim here rests solely on the same faulty foundation upon which they base some of their arguments as to lack of notice, I find that the fraudulent inducement argument fails.

### 2. Unconscionability of the Arbitration Provision

Plaintiffs' final claim is that the arbitration provision contained in Airbnb's TOS is unconscionable. To find an arbitration clause unconscionable, I must find both procedural and substantive unconscionability. *See, e.g.*, *Merkin v. Vonage Am., Inc.*, 639 F. App'x 481 (9th Cir. 2016) ("Under California law, a contract must be both procedurally and substantively unconscionable to be rendered invalid." (citations omitted)); *Mazzola v. Roomster Corp.*, 849 F. Supp. 2d 395, 406 (S.D.N.Y. 2012); *Baltazar v. Forever 21, Inc.*, 367 P.3d 6, 11 (Cal. 2016) ("[A] finding of procedural unconscionability does not mean that a contract will not be enforced, but rather that courts will scrutinize the substantive terms of the contract to ensure they are not manifestly unfair or one-sided." (alteration in original) (citation omitted)). Plaintiffs bear the burden of proving unconscionability. *See Smith v. Vmware, Inc.*, No. 15-CV-03750, 2016 WL 54120, at *3 (N.D. Cal. Jan. 5, 2016).

One common definition of unconscionability as it relates to contract formation is the

"absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Sanchez v. Valencia Holding Co., LLC*, 353 P.3d 741, 748 (Cal. 2015) (internal quotation marks omitted) (citation omitted). This formulation divides unconscionability into a procedural and substantive element, with the first addressing "oppression or surprise due to unequal bargaining power," and the second addressing "overly harsh or one-sided results." *Id.; see also Baltazar*, 367 P.3d at 11. "Oppression" is defined as an "inequality of bargaining power resulting in no real negotiation and absence of meaningful choice", and "surprise" as to what occurs when "the supposedly agreed-upon terms of the bargain are hidden in a prolix printed form drafted by the party seeking to enforce the disputed terms." *Dean Witter Reynolds, Inc. v. Superior Court*, 259 Cal. Rptr. 789, 795 (Ct. App. 1989) (citations omitted). Procedural and substantive unconscionability do not need to be present to the same degree, and courts invoke a "sliding scale" to determine whether a contract or arbitration provision is, as a whole, unenforceable, taking into account the relevant factors supporting each type of unconscionability. *See Sanchez*, 353 P.3d at 748.

California law strongly supports the notion that substantive unconscionability is "concerned not with 'a simple old-fashioned bad bargain,' but rather terms that are '*unreasonably* favorable to the more powerful party,'" which includes "terms that impair the integrity of the bargaining process or otherwise contravene the public interest or public policy; terms (usually of an adhesion or boilerplate nature) that attempt to alter in an impermissible manner fundamental duties otherwise imposed by the law, fine-print terms, or provisions that seek to negate the reasonable expectations of the nondrafting party, or unreasonably and unexpectedly harsh terms having to do with price or other central aspects of the transaction." *Id.* (citations omitted) (emphasis added). Specifically, and given that "[n]ot all one-sided contract

provisions are unconscionable," when looking at substantive unconscionability, the unconscionability doctrine is concerned with contractual terms that are "*overly* harsh," "*unduly* oppressive," "*unreasonably* favorable," or "so one-sided as to shock the conscience." *Id.* (emphasis in original); *see also Peng v. First Republic Bank*, 162 Cal. Rptr. 3d 545, 550 (Ct. App. 2013) (noting that some courts have imposed a higher standard than "merely one-sided or overly harsh," that is, that the terms must be "so one-sided as to *shock the conscience*" (citation omitted) (emphasis in original)). The unconscionability of a contractual provision is a highly contextual inquiry, with the ultimate issue being "whether the terms of the contract are sufficiently unfair, in view of all of the relevant circumstances, that a court should withhold enforcement." *Sanchez*, 353 P.3d at 749.

Here, Plaintiffs claim that the arbitration provision is unconscionable for myriad reasons. With respect to procedural unconscionability, Plaintiffs first refer to the factual circumstances surrounding Airbnb's insertion of the arbitration provision into the TOS in 2011—namely, the insertion of the clause without notification to existing users, the lack of any bolding or capitalization to draw the attention of new users, and the alleged "hidden" nature of the clause. (Pls.' Mem. 22.) Presumably, Plaintiffs' argument focuses on the definition of surprise as occurring when "the terms of the bargain are hidden in a prolix printed form drafted by the party seeking to enforce the disputed terms." *Dean Witter Reynolds*, 259 Cal. Rptr. at 795. In addressing these arguments, I note again that the arbitration provision was present when Plaintiff Plazza first signed up for his account and that the revised TOS containing the arbitration clause was presented to Plaintiff Naude when she attempted to access her account on May 22, 2012. In any event, beginning in 2011, the arbitration clause was set off by a bolded heading titled "Dispute Resolution," with various sections of information—including "Arbitration Rules and

Governing Law" and "Arbitration Process"—underlined. (Miller Decl. Exs. 4–8.) Furthermore, beginning in 2012, the TOS included a capitalized admonition at the very outset that referred to "A CLAUSE THAT GOVERNS THE JURISDICTION AND VENUE OF DISPUTES," (*id.* Exs. 5–8), minimizing any impact that the location of the arbitration provision itself would have. Finally, although the 2011 modification did not present such a warning at the top of the agreement, California courts have found that parties are "under no obligation to highlight the arbitration clause of [a] contract, nor [are they] required to specifically call that clause to [the other party's] attention." *Sanchez*, 353 P.3d at 751 (noting that a state law to the contrary would be preempted by the FAA).

Plaintiffs' second argument of procedural unconscionability relates to the unavailability of the arbitration rules. (Pls.' Mem. 22–23.) However, this fact alone does not necessitate a finding of procedural unconscionability. *See, e.g.*, *Lane v. Francis Capital Mgmt. LLC*, 168 Cal. Rptr. 3d 800, 812 (Ct. App. 2014) (holding that the failure to attach a copy of the AAA rules did not render the agreement procedurally unconscionable, as those were easily available on the Internet and plaintiff did not lack the means or capacity to locate and retrieve a copy of the rules); *Peng*, 162 Cal. Rptr. 3d at 551–52 (finding case law cited by the plaintiffs on the failure to attach arbitration rules unpersuasive); *Smith*, 2016 WL 54120, at *3 (noting it was "difficult to believe" that the plaintiff, a software executive, would have trouble locating the AAA rules). In fact, the one case upon which Plaintiffs rely, *Harper v. Ultimo*, 7 Cal. Rptr. 3d 418 (Ct. App. 2003), was later distinguished by the California Court of Appeals, which emphasized that *Harper* involved the Better Business Bureau arbitration rules, which precluded the consumer from obtaining damages and substantively limited the defendant's exposure. *See Peng*, 162 Cal. Rptr. 3d at 551–52; *see also Harper*, 7 Cal. Rptr. 3d at 423 (emphasizing that "there is not even

the possibility of full relief").  Plaintiffs have not alleged that the AAA rules are similar in any way to the rules discussed in *Harper*.

Airbnb's TOS is a standard adhesion contract, which does suggest some level of procedural unconscionability.  *See Baltazar*, 367 P.3d at 11 (explaining that "[o]rdinary contracts of adhesion, although they are indispensable facts of modern life that are generally enforced, contain a degree of procedural unconscionability even without any notable surprises, and 'bear within them the clear danger of oppression and overreaching'" (citations omitted)).  However, this is not sufficient to invalidate the arbitration provision.  *See, e.g.*, *Lane*, 168 Cal. Rptr. 3d at 810–11; *Marin*, 107 Cal. Rptr. 2d at 655 (stating that adhesive contracts are not "per se oppressive").  Although Airbnb's arbitration provision could be viewed as somewhat procedurally unconscionable because it is adhesive, the factual circumstances present do not rise to the level of being an unfair surprise or unduly oppressive, such that they warrant invalidation of the arbitration provision.  *See Concepcion*, 563 U.S. at 346–47 ("[T]he times in which consumer contracts were anything other than adhesive are long past.").

In defense against procedural unconscionability, Defendant also cites case law determining that contracts that concern nonessential activities cannot be procedurally unconscionable.  *See, e.g.*, *Mazzola*, 849 F. Supp. 2d at 406–07; *Bassett v. Elec. Arts Inc.*, No. 13-CV-4208, 2015 WL 1298644, at *11 (E.D.N.Y. Feb. 9, 2015), *report and recommendation adopted,* 93 F. Supp. 3d 95 (E.D.N.Y. 2015); *Pokrass v. DirecTV Grp., Inc.*, No. 07-CV-423, 2008 WL 2897084, at *6 (C.D. Cal. July 14, 2008).  I note that the majority of the case law cited involves recreational nonessential activities.  *See, e.g.*, *Pokrass*, 2008 WL 2897084, at *7; *Bassett*, 2015 WL 1298644, at *11.  Defendant does, however, cite one case where the nonessential activity is not recreational.  *See Mazzola*, 849 F. Supp. 2d at 406–07 (involving a

website that helps match individuals with potential roommates).  Although the instant case is somewhat different in that Airbnb's hosts use the website as a source of business-related income, I still find *Mazzola* informative and note that Plaintiffs did have the option of "simply foregoing the activity."[28]  In fact, Plaintiff Naude had her own website renting out her apartment spaces prior to joining Airbnb.  (Nadler Decl. Exs. E–F; Naude Decl. ¶ 2; Def.'s Mem. 14 n.3.)  In addition, Plaintiffs could have opted to use other websites that offer similar apartment rental services, such as craigslist.com.

With respect to substantive unconscionability, California courts have presented some examples of what is considered "overly harsh," "unduly oppressive," or "so one-sided so as to shock the conscience," such that substantive unconscionability can be found.  *See Mikhak v. Univ. of Phoenix*, No. C16-0090, 2016 WL 3401763, at *8 (N.D. Cal. June 21, 2016) ("Substantive unconscionability focuses on the 'terms of the agreement and whether those terms are so one-sided as to shock the conscience.'" (citation omitted)).  Circumstances that may merit a finding of substantive unconscionability include "terms that impair the integrity of the bargaining process or otherwise contravene the public interest or public policy; terms (usually of an adhesion or boilerplate nature) that attempt to alter in an impermissible manner fundamental duties otherwise imposed by the law, fine-print terms, or provisions that seek to negate the reasonable expectations of the nondrafting party, or unreasonably and unexpectedly harsh terms having to do with price or other central aspects of the transaction."  *Baltazar*, 367 P.3d at 11–12.

With respect to substantive unconscionability, Plaintiffs argue only that the arbitration clause suffers from a lack of mutuality.  (Pls.' Mem. 23–25.)  In support of this claim, Plaintiffs

---

[28] Plaintiffs state that they felt forced into accepting the modified TOS because they otherwise would be unable to access their account information.  Plaintiffs do not explain why this justifies failure to read the contract, nor do they state that they otherwise requested that Airbnb provide to them, and delete from its own servers, any personal, account-related information.

focus on two aspects of the clause: first, while the clause allows either party the ability to seek injunctive or equitable relief in court to prevent various intellectual property issues, these are in reality claims more likely to be brought by Airbnb; and second, the class action waiver only really targets customers, as Airbnb is not likely to bring a class action lawsuit.[29]  To take on the second issue first, finding Airbnb's arbitration clause substantively unconscionable essentially because it contains a class action waiver would contravene the intent of *Concepcion*, which found that the FAA prohibits conditioning the enforceability of certain arbitration agreements on the availability of class-wide arbitration procedures.  *Concepcion*, 563 U.S. at 336.  In fact, the drafter of the arbitration provision in *Concepcion* was, like in most consumer contracts, a major company.  To thus find that Airbnb's arbitration provision is unconscionable on this basis would be inconsistent with *Concepcion* and must be rejected.

Plaintiffs' first argument—that the arbitration provision is substantively unconscionable because Airbnb is more likely to bring an action for injunctive or equitable relief with respect to intellectual property issues—is also unpersuasive, and certainly does not bring the provision to the level of "shocking the conscience."  *Cf. Peng*, 162 Cal. Rptr. 3d at 553 (noting that substantive unconscionability "typically is found in the employment context when the arbitration agreement is 'one-sided' in favor of the employer without sufficient justification, for example, when 'the employee's claims against the employer, but not the employer's claims against the employee, are subject to arbitration'" (citations omitted));  *Mikhak*, 2016 WL 3401763, at *13 (holding that the arbitration agreement had "only minor substantive unconscionability" given a unilateral modification clause).  Particularly given the otherwise mutual application of the claims

---

[29] As an aside, Plaintiffs also cite to a clause in the section limiting liability, which is not part of the arbitration provision they argue is unconscionable.  (Pls.' Mem. 24–25.)  To the extent that Plaintiffs are arguing that this portion of the agreement is also unconscionable, I leave that to the arbitrator to decide.

subject to arbitration to both Airbnb and its users, I do not find that the separate carve-out for these intellectual property claims to be substantively unconscionable. *See Saincome v. Truly Nolen of Am., Inc.*, No. 11-CV-825, 2011 WL 3420604, at *7–8 (S.D. Cal. Aug. 3, 2011) (holding that to find a neutrally worded employer-employee arbitration agreement substantively unconscionable because it is more likely for the employee to bring a particular type of claim would "be to render almost all such agreements automatically unenforceable, regardless of how they are drafted").

Since any argument that the arbitration clause at issue here is procedurally or substantively unconscionable is unpersuasive and not supported by the case law; I find that the arbitration clause in Airbnb's TOS is not unconscionable.

## C.    *To Stay or Dismiss*

Although Defendant urges that I dismiss this action, I find that a stay, rather than dismissal, is appropriate given the Second Circuit's holding in *Katz v. Cellco Partnership*, 794 F.3d 341 (2d Cir. 2015), and subsequent case law addressing the same issue. In *Katz*, the Second Circuit, citing Section 3 of the FAA, found that "a stay of proceedings [is] necessary after all claims have been referred to arbitration *and a stay requested*." *Id.* at 345 (emphasis added); *see also* 9 U.S.C. § 3 (a district court, upon being satisfied that an issue is arbitrable, "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement"). Although the Second Circuit only decided the issue in the context of the moving party having requested the stay, the Second Circuit opted to stay rather than dismiss the proceedings for reasons applicable here, including that the dismissal of an arbitrable matter would convert the decision into an appealable order, thus controverting the FAA's underlying policy "to move the parties to an arbitrable dispute out of court and into

32

arbitration as quickly and easily as possible." *Id.* at 346 (quoting *Moses H. Cone*, 460 U.S. at 22); *see, e.g.*, *Virk v. Maple-Gate Anesthesiologists, P.C.*, No. 15-CV-513, 2016 WL 3583248, at *1 (2d Cir. July 1, 2016) (applying *Katz* in finding that the district court lacked discretion to dismiss the case where the defendant's motion to compel arbitration sought either a stay or dismissal); *Zambrano v. Strategic Delivery Sols., LLC*, No. 15-CV-8410, 2016 WL 5339552, at *10 (S.D.N.Y. Sept. 22, 2016) (finding that, where the defendants sought a dismissal rather than a stay, the court had discretion to decide whether to stay or dismiss but decided to stay the action based on the reasoning articulated in *Katz*). As a result, I exercise my discretion to impose a stay pending the outcome of arbitration.

## V. Conclusion

For the foregoing reasons, Defendant's motion to compel arbitration and dismiss the action is GRANTED in part and DENIED in part, and this action is STAYED pending the outcome of arbitration. The Clerk of the Court is respectfully directed to close this motion on the docket.

SO ORDERED.

Dated: January 26, 2018
New York, New York

Vernon S. Broderick
United States District Judge

33